IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CINDY HOEDEL, et al.,

Plaintiffs,

v.                                                      Case No. 2:19-cv-02443-HLT-JPO

DUSTIN KIRK, et al.,

Defendants.

## MEMORANDUM AND ORDER

Plaintiffs Cindy Hoedel and Scott Yeargain sued Defendants Dustin Kirk, Shari Feist Albrecht, Susan Duffy, Dwight Keen, and Jay Emler for First Amendment retaliation. Albrecht, Duffy, Keen, and Emler—all current or former Commissioners on the Kansas Corporation Commission ("KCC")— move to dismiss. Doc. 40.[1] Specifically, Albrecht, Keen, and Emler, sued in their individual capacity, argue they are entitled to absolute or qualified immunity. Albrecht and Keen, as well as Duffy, are also sued in their official capacity, and they argue Plaintiffs are not entitled to any prospective injunctive relief—the only relief permitted under the Eleventh Amendment.

The Court finds that Albrecht, Keen, and Emler are entitled to absolute immunity on the individual-capacity claims because the conduct alleged was related to their quasi-judicial duties. Even if absolute immunity did not apply, qualified immunity would shield them from individual liability. The official-capacity claims against Albrecht, Keen, and Duffy are likewise dismissed

---

[1]   Kirk does not join the motion to dismiss. Any reference to "Defendants" in this order is to Albrecht, Keen, Emler, and Duffy only.

because Plaintiffs have failed to allege that they have standing to pursue prospective injunctive relief based on ongoing constitutional violations.

## I.      BACKGROUND[2]

The KCC is a state agency responsible for regulating oil and gas drilling in Kansas, including issuing permits for injection wells. Doc. 31 at ¶ 18. When an oil company seeks an injection-well permit, the surrounding landowners and the general public are given notice. *Id.* at ¶ 19. An interested party may protest the application if it believes the proposed injection well will damage oil, gas, or water resources. *Id.*

The KCC holds hearings when a protest is filed. *Id*. Prior to those hearings, the KCC convenes a prehearing conference that is presided over by KCC staff attorneys. *Id.* at ¶ 20. The purpose of a prehearing conference is to schedule prehearing deadlines, consolidate protests, and identify witnesses. *Id.* At a prehearing conference, the oil company can move to dismiss protesters, and protesters can file briefs defending their involvement. *Id.* at ¶ 21. Protesters can also file prewritten testimony and request discovery. *Id.* KCC Commissioners preside over the injection-well hearings and issue written findings and recommendations regarding protester standing and whether to approve or deny the injection-well application. *Id.* at ¶ 22.

---

[2]    These facts are taken from the well-pleaded factual allegations in the amended complaint, Doc. 31, and also from the exhibits submitted with the motion to dismiss, to the extent those documents are referenced or quoted in the amended complaint and are central to the claims in this case. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."). In considering these materials, although it accepts as true the well-pleaded factual allegations and draws all reasonable inferences in favor of Plaintiffs, where there is a conflict between the allegations and the exhibits, the exhibits control. *See Jackson v. Alexander*, 465 F.2d 1389, 1390 (10th Cir. 1972) ("[W]e need not accept as true . . . allegations of fact that are at variance with the express terms of an instrument attached to the complaint as an exhibit and made a part thereof.").

Albrecht, Keen, and Duffy are current Commissioners for the KCC. *Id.* at ¶¶ 14-16. Emler previously served as a Commissioner from 2014 through 2019. *Id.* at ¶ 17. Kirk was at all relevant times Deputy General Counsel for the KCC. *Id.* at ¶ 13.

Hoedel is a Kansas resident who has filed several protests with the KCC to oppose injection-well sites near her home. *Id.* at ¶ 11. She has participated in prehearing conferences presided over by Kirk and appeared at injection-well hearings presided over by the Commissioners. *Id.* at ¶¶ 24-25. In 2017 and 2018, Hoedel's activity before the KCC received consistent press coverage, including her discovery that the KCC had improperly issued certain permits. *Id.* at ¶ 26. She has also coordinated with other citizens to protest injection-well applications across Kansas. *Id.* at ¶ 24.

In 2018, Hoedel filed a protest against two injection-well applications in Barton County. *Id.* at ¶ 27. Kirk was the attorney assigned to preside over the prehearing conferences for both applications. *Id.* In May 2018, Hoedel sent emails to other protesters on the Barton County applications, telling them they would need to join the prehearing conference or else risk being removed from the docket. *Id.* at ¶ 28. Hoedel also told the other protesters that she typically pre-files testimony and offered a sample. *Id.* She copied Kirk on both emails. *Id.* Kirk later raised concerns with each of the Commissioners that Hoedel was coordinating with other protesters. *Id.* at ¶ 29. But during the prehearing conference, Kirk never expressed concerns about Hoedel's actions, and at no point did Hoedel represent that she was speaking on behalf of any of the other protesters. *Id.* at ¶ 31.

Yeargain is also a Kansas resident who has protested several injection-well applications. *Id.* at ¶¶ 12, 33. Yeargain was one of several protesters on a different injection-well application in May 2018 where Kirk was the presiding officer for the prehearing conference. *Id.* at ¶ 34. Two

other protesters, Ken and Susan Peterson, were going to be out of town when the prehearing conference occurred. *Id.* at ¶ 35. Peterson emailed Kirk and asked whether they could designate Yeargain to relay their dates of availability during the prehearing conference. *Id.* at ¶¶ 35-36. Kirk spoke with the Commissioners about Yeargain assisting the Petersons, and later told Peterson that Yeargain is not a licensed attorney and could not represent other individuals at the preconference hearing. *Id.* at ¶ 38.

On May 14, 2018, Kirk emailed a contact at the Kansas Attorney General's office. The emailed stated:

> I apologize if I am starting in the wrong place here but I have your contact information and you have been more than helpful to our agency in the past. I have a matter involving consumer protection that has risen in the context of our agency's quasi-judicial proceedings. We know that the Attorney General would have jurisdiction but we were unsure in how to handle the matter currently. It happens to be somewhat of a hot topic. I would like to speak with an attorney on this and I didn't know if the normal consumer protection hotline would get me to where I needed or not.
>
> Please let me know when you may have a moment to speak with me or please direct to someone who I may need to talk with on this if not you. I greatly appreciate your time.

Doc. 41-8 at 2.[3] Kirk later spoke with someone at the Kansas Attorney General's office and followed up in an email on June 12, attaching the Hoedel and Peterson emails as evidence of the unauthorized practice of law. Doc. 31 at ¶¶ 41, 51. That email stated:

> It was nice speaking with you yesterday. Please see attached a few e-mails and another pleading that we have received that allude to the possible violation regarding the unauthorized practice of law. I realize that this is pretty minimal to go on at this point but we do

---

[3] The amended complaint states that Kirk sent the May 14 email to "express that he and the Defendant Commissioners were concerned that Ms. Hoedel had engaged in the unauthorized practice of law," and that it was sent by Kirk on behalf of the Commissioners. Doc. 31 at ¶ 30. But the May 14 email does not directly reference either Hoedel or the unauthorized practice of law. The email also does not directly reference any of the Commissioners, other than the use of the word "we," which the amended complaint suggests refers to the KCC. *Id.* at ¶ 50.

> feel that the relevant conversations demonstrate that a non-licensed individual is drafting or sharing legal pleadings for filing and use before the Commission in quasi-judicial proceedings.
>
> We certainly may have additional information that may be relevant and we can help garner more KCC pleadings and e-mails on these particular dockets should that be helpful. These pro se litigants have also at times attempted to represent their respective groups in proceedings before the Commission, however, we have issued ruling attempting to quash that practice.
>
> I am happy to share more information or share with you the intricacies of these cases. I can also draft up a more formal complaint if you'd rather have something of that nature instead of this e-mail and a few documents. Please advise on the next steps.

Doc. 41-10 at 2.[4] Both Kirk's May 14 and June 12 emails were sent from his KCC email address and both used the word "we," presumably referring to the KCC or the Commissioners. *Id.* at ¶¶ 50, 52-53.

The Kansas Attorney General's office notified both Hoedel and Yeargain that they were under investigation. *Id.* at ¶ 58. Hoedel was asked to provide a response to the allegations, though the Kansas Attorney General's office later closed the investigation. *Id.* at ¶¶ 59-60. Hoedel claims the investigation caused her significant anxiety and distress, and adversely impacted her bid for a seat on the Chase County Commission. *Id.* at ¶ 60. Yeargain was never notified that the investigation into his activities was closed, and as far as he knows, it is still ongoing. *Id.* at ¶ 62. Yeargain has experienced mental distress as a result. *Id.* at ¶ 63. Both Hoedel and Yeargain have "ceased or curtailed their coordinated advocacy activities" in front of the KCC out of fear that they would draw additional complaints for the unauthorized practice of law. *Id.* at ¶ 65. Hoedel is fearful

---

[4]   The amended complaint states that Kirk filed a formal complaint on June 12. Doc. 31 at ¶ 41. The June 12 email says Kirk was willing to "draft up a more formal complaint" in lieu of the email, but it is unclear whether he did. Accordingly, it is unclear whether the June 12 email and the "formal complaint" referenced in the amended complaint are the same thing.

that the KCC will report her activities in the future. *Id.* at ¶ 70. Yeargain believes he has been further targeted by the KCC by being placed on a "no-contact list" for KCC staff. *Id.* at ¶ 71.

The KCC regularly encounters individuals without law licenses attempting to appear on behalf of injection-well applicants in KCC proceedings. *Id.* at ¶ 42. Although staff counsel and prehearing officers have objected to those unlicensed individuals appearing, none of them have been reported. *Id.* at ¶¶ 43-44. Non-attorney protesters have also tried to appear on each other's behalf, but no complaints were filed with the Kansas Attorney General's office. *Id.* at ¶¶ 45-46.

The amended complaint alleges one count of retaliation in response to Plaintiffs' First Amendment activity. *Id.* at ¶¶ 72-77. Plaintiffs sue Albrecht and Keen in both their official and individual capacities, Duffy in her official capacity only, and Emler in his individual capacity only. *See generally id.*[5] Plaintiffs seek damages and injunctive relief.

## II.    STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if it is accompanied by enough factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotations omitted).

---

5    Kirk is named in his individual capacity.

III.    **ANALYSIS**

Defendants move to dismiss the individual-capacity claims against Albrecht, Keen, and Emler based on both absolute and qualified immunity. They move to dismiss the official-capacity claims against Albrecht, Keen, and Duffy on Eleventh Amendment immunity grounds. They also argue generally Plaintiffs fail to state a claim or assert sufficient grounds for injunctive relief.

A.      **Individual-Capacity Claims Against Albrecht, Keen, and Emler**

1.      **Absolute Immunity**

Where executive officials serve in quasi-judicial roles, they are entitled to the same absolute immunity afforded to judges, prosecutors, and jurors. *Horwitz v. State Bd. of Med. Examiners*, 822 F.2d 1508, 1514 (10th Cir. 1987) (citing *Butz v. Economou*, 438 U.S. 479, 513 (1978)). This rule extends to state administrative and executive officials who serve in "adjudicative, judicial, or prosecutorial capacities." *Id.* at 1515.

Once the immunity attaches, it is broad. *See id.* at 1515. There are only two exceptions to this immunity. First, there is no immunity for non-judicial actions, and second, there is no immunity for judicial actions taken in the complete absence of jurisdiction. *Roemer v. Crow*, 993 F. Supp. 834, 836 (D. Kan. 1998) (quoting *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991)); *see also Guttman v. Khalsa*, 446 F.3d 1027, 1033-34 (10th Cir. 2006) ("Only accusations that a judge was not acting in his judicial capacity or that he acted in the complete absence of all jurisdiction can overcome absolute immunity.").

There seems to be little dispute that the KCC hearings at issue here are quasi-judicial. Plaintiffs admit as much in their response: "KCC injection well protest proceedings are quasi-

judicial in nature." Doc. 45 at 3. Defendants also cite to several regulations governing KCC hearings, Doc. 41 at 11 n.12, and those procedures are similar to judicial procedures.[6]

Plaintiffs nevertheless argue that Defendants' <u>act</u> of reporting them for the unauthorized practice of law was not a judicial action, even if at the time it was done Defendants were serving in their quasi-judicial role as KCC Commissioners. Doc. 45 at 16-17. The test for determining whether an act is judicial in nature has two parts.[7] First, courts consider whether the act bears relation to a function normally performed by a judge. Second, courts consider whether the parties dealt with the judge in his or her judicial capacity. *Brookings v. Clunk*, 389 F.3d 614, 617-18 (6th Cir. 2004); *see also Roemer*, 993 F. Supp. at 836 ("What constitutes a judicial act for the purposes of immunity is determined by 'whether it is a function normally performed by a judge' and whether the parties understood that they were dealing with the judge 'in his judicial capacity.'" (quoting *Stump v. Sparkman*, 435 U.S. 349, 362 (1978))).

Based on the allegations in the complaint, the Court concludes Defendants' actions were judicial—or quasi-judicial—in nature.[8] The act of reporting a suspected violation of the

---

[6]   KCC hearings are generally governed by the rules of evidence; witnesses are subject to examination and cross examination under oath; and testimony is taken on the record. *See generally* K.A.R. § 82-1-230. Parties may appear on their own behalf or be represented by a licensed attorney. K.A.R. § 82-1-228(d)(1). Attorneys and other representatives are held to the same standards of conduct as in the district courts in Kansas. *Id.* at § 82-1-228(f)(1). Like in judicial matters, prehearing conferences may be convened to narrow or simplify issues, address amendments to pleadings, consider stipulations and factual admissions, and take up other matters that "may aid in the disposition of the proceeding." K.A.R. § 82-1-222(a). The regulations governing hearings before the Commissioners also apply to hearings conducted by a presiding officer. K.A.R. § 82-1-228(a). Kirk was the presiding officer over both prehearing conferences involving Hoedel and Yeargain. Doc. 31 at ¶¶ 24, 34.

[7]   Although Plaintiffs concede KCC proceedings are quasi-judicial, they argue that a three-prong test from *Horwitz* applies to determine whether quasi-judicial immunity applies. *See Horwitz*, 822 F.2d at 1513 (stating that judicial immunity extends to administrative officials if three criteria are met: (1) similarity of function to those involved in the judicial process; (2) official action likely to result in damages lawsuits by disappointed parties; and (3) sufficient safeguards within the regulatory framework to control unconstitutional conduct). But that standard appears to address to whether an administrative official's role is sufficiently analogous to a judicial role to be considered quasi-judicial in the first place. Whether the <u>conduct in question</u> arises out of those quasi-judicial duties—the focus of Plaintiffs' argument—is a different analysis.

[8]   The parties disagree whether the amended complaint alleges enough conduct by the Commissioners—as opposed to Kirk—to maintain claims against them. The Court agrees that the amended complaint is very light on any actual conduct by the Commissioners. Generally, it just alleges that Kirk spoke with them before sending the emails,

unauthorized practice of law relates to a function normally performed by a KCC presiding official, to the extent it relates to the management of KCC proceedings. Here, Plaintiffs were reported precisely because they were thought to be representing others in KCC proceedings.[9] Second, the Defendants were acting in their capacity as KCC officials when the action was taken.

Other courts have found similar actions to be judicial in nature. *See Martinez v. Winner*, 771 F.2d 424, 435 (10th Cir. 1985) ("A judge is not only entitled but also has a duty to take all lawful measures reasonably necessary to prevent the occurrence of a crime in his courtroom."); *Brookings*, 389 F.3d at 622 ("Judge Clunk is entitled to immunity for this action [of initiating criminal proceedings against Brookings] because it was taken in an effort to preserve the integrity of the judicial system.").

Plaintiffs argue initiation of a complaint about the unauthorized practice of law "does not remotely resemble" and "does not arise out of a hearing or any function resembling the judicial process," and that it is conduct beyond the duty imposed on Defendants by law. Doc. 45 at 16-17. But this ignores the fact that the actions complained of occurred in the context of a KCC hearing over which Defendants were presiding. Although Defendants are not specifically tasked with reporting the potential unauthorized practice of law, they are tasked with overseeing KCC hearings where individuals must either represent only themselves or be represented by licensed attorneys.

---

which used the word "we." Given the immunity analysis, however, the Court will assume without deciding that the amended complaint alleges sufficient action by the Commissioners themselves.

[9]  To be clear, the Court does not conclude that Plaintiffs were, in fact, engaged in any improper behavior, including the unauthorized practice of law, because that is not at issue. What's at issue is whether Defendants' act of reporting as much is related to their duties of presiding over KCC hearings. The Court finds it is. Whether Defendants' suspicions were correct or baseless or even retaliatory is not relevant to the immunity inquiry. *See Price v. Vratil*, 2009 WL 1424512, at *4 (D. Kan. 2009); *Brookings*, 389 F.3d at 617 ("In fact, judicial immunity applies to acts performed maliciously and corruptly as well as acts performed in bad faith or with malice as has been alleged in this case.").

To the extent those procedural rules are flouted, any action taken as a result arises out of their roles as KCC officials.

Even though making a complaint is not a common judicial or quasi-judicial action, it certainly underlines to a normal judicial function, including the preservation of the integrity of the judicial system. *See Brookings*, 389 F.3d at 621-22. If a presiding official could not act against suspected malfeasance occurring within a proceeding without risking incurring personal liability, they would effectively lose the ability to function as a presiding official. This is the entire reason judicial and quasi-judicial officials are given absolute immunity. *See id.* at 621 ("Additionally, if litigants are able to perpetrate fraud on courts and subsequently threaten judges with personal liability for reporting such behavior, the integrity of the judicial system is jeopardized.").

Although the Court agrees that Defendants are not necessarily immune for any action they might take just because they happen to be KCC Commissioners, the Tenth Circuit has directed that immunity extends to "all acts of the official performing statutory duties as having '[m]ore or less connection with the general matters committed by law' to [their] station." *Horwitz*, 822 F.2d at 1515 (quoting *Spalding v. Vilas*, 161 U.S. 483, 498 (1869)). Here, where Defendants ostensibly believed that Plaintiffs were engaging in the unauthorized practice of law before the KCC, that standard is met. Accordingly, the Court finds that Defendants Albrecht, Keen, and Emler are entitled to absolute immunity for any individual-capacity claims against them in this case.[10]

---

[10] Plaintiffs' complaint includes a brief allegation that, "[o]n information and belief, Defendant Commissioners have continued to target Mr. Yeargain and other oil injection protesters with retaliation for their participation in protected First Amendment activity by placing them on a 'no-contact list' for KCC staff," which apparently means a list of protesters that KCC staff cannot speak to. Doc. 31 at ¶¶ 7, 71. It is not clear whether Hoedel is involved in this claim. Nor are there any allegations stating when this occurred, or how being on a "no-contact list" has injured Yeargain. Neither party addresses this allegation in the context of the absolute-immunity analysis. But as discussed below, the Court finds that qualified immunity would shield Defendants as to this claim, to the extent it is distinct from the allegation regarding the report to the Kansas Attorney General's office.

### 2.     Qualified Immunity

Even if the Court did not find that Albrecht, Keen, and Emler were entitled to absolute immunity, the Court would conclude they were entitled to qualified immunity. Qualified immunity is meant to protect public servants—"all but the plainly incompetent or those who knowingly violate the law"—from the burdens of lawsuits. *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010). Once a defendant asserts qualified immunity, the plaintiff must show that: (1) a defendant's actions violate a constitutional right and (2) the constitutional issue was clearly established at the time of the defendant's actions. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The order in which these two prongs are evaluated is discretionary. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

The parties dedicate significant space to discussing whether Plaintiffs' amended complaint sufficiently alleges a constitutional violation against the Commissioners. The Court need not analyze those arguments, however, because even if there was a violation, it was not clearly established. To be clearly established, the contours of the right must be sufficiently clear so that the official would know that what he was doing violated the right. *Id.* at 741. Although there need not be a case directly on point, judicial precedent—either controlling authority or "a robust consensus of cases of persuasive authority"—must have "placed the statutory or constitutional question beyond debate." *Id*. at 741-42 (internal quotations and citations omitted); *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) ("A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation." (quoting *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017))).

Plaintiffs point to two cases—one in the District of Kansas and an unpublished Tenth Circuit opinion—that they say put Defendants "on reasonable notice that their precise conduct is unconstitutional"—specifically, reporting the unauthorized practice of law and placing Yeargain on a "no-contact list." Doc. 45 at 20. The Court disagrees that the law cited demonstrates that Defendants' conduct violated clearly established law.

In *Glover v. Mabrey*, a government contractor alleged that certain state officials drafted a report recommending that the plaintiff be suspended from obtaining future bids in retaliation for publicly critical statements. *Glover v. Mabrey*, 384 F. App'x 763, 774 (10th Cir. 2010). At most, however, *Glover* establishes generally that retaliatory conduct taken in response to protected First Amendment activity is actionable, which is not enough in a qualified-immunity analysis. *al-Kidd*, 563 U.S. at 742.[11] *Glover* is not otherwise factually analogous.[12]

Plaintiffs also cite to *McCormick v. City of Lawrence*. In *McCormick*, an assistant attorney general warned an opposing pro se litigant not to practice law and referred him for further investigation. *McCormick v. City of Lawrence*, 2008 WL 1793143, at *16 (D. Kan. 2008). The court found that the facts, viewed in a light favorable to the plaintiff, established a constitutional violation, but nevertheless granted qualified immunity because the law was not clearly established. *Id.* at *15-*17. Plaintiffs argue that *McCormick* put Defendants on notice that their conduct was unconstitutional. In other words, *McCormick* is the clearly established law that was missing in *McCormick*. See Doc. 45 at 21 n.3.

---

[11] The same is true for Plaintiffs' citations to other general holdings that the First Amendment prohibits retaliation by government officials. Doc. 45 at 19-20.

[12] The court in *Glover* analyzed the retaliation claims under the *Pickering* analysis used for retaliation claims brought by government employees—a relationship not at issue here. *Glover*, 384 F. App'x at 769. *Glover* also specifically found that an allegation that a state official wrongfully encouraged another official to investigate the plaintiff "triggers the multi-layered causation pleading requirements" demonstrating that the second official lacked cause to undertake the investigation. *Id.* at 772.

The Court agrees that the facts of *McCormick* are more like this case than *Glover*. But they are still distinct. *McCormick* involved opposing parties in a lawsuit. Here, Defendants were presiding officials in a quasi-judicial hearing. Given this distinction, the Court questions how analogous *McCormick* is to this case, especially considering the caselaw discussed above that suggests quasi-judicial officials are entitled to absolute immunity. As the court in *McCormick* noted, "while the facts of the case need not be identical, they must be sufficiently analogous to satisfy the particularized context necessary to support liability." *McCormick*, 2008 WL 1793143, at *15.

Further, the Court disagrees that *McCormick* alone is enough to satisfy the clearly-established prong. The court in *McCormick* even noted that "it was not even readily apparent . . . that the summary judgment record demonstrates the violation of a constitutional right" in that case. *Id.* at *17. A plaintiff typically demonstrates clearly established law by pointing to on-point Supreme Court or Tenth Circuit decision. *Knopf*, 884 F.3d at 944. *McCormick* is another district court case that is not binding on this Court. And even to the extent it is persuasive authority, it alone cannot be "a robust 'consensus of cases of persuasive authority'" that places "the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741 (internal quotations and citations omitted).

Plaintiffs cite two other cases to show that being placed on a "no-contact list" violated their clearly established rights.[13] Both are district-court cases from outside this district, and both are distinguishable. The first, *P&J Empire Auto, Inc. v. Town of Newburgh*, involved the removal of a towing company from a list of approved towing services ostensibly in retaliation for protected

---

[13]   Again, the amended complaint only alleges that Defendants placed Yeargain on the "no-contact list." *See supra* note 10.

conduct. 2018 WL 1275716, *4-*5 (S.D.N.Y. 2018). But it is not clear that being removed from a list of approved towing services, which likely has financial ramifications, is akin to a citizen being put on a "no-contact list" for KCC staff, whatever that entails. Plaintiffs also cite *Downie v. City of Middleburg Heights* for the proposition that a "blackball memo" clearly violates the First Amendment. 76 F. Supp. 2d 794, 797-98 (N.D. Ohio 1999). But the so-called "blackball memo" in *Downie* was alleged to have interfered with the plaintiff's employment or work opportunities—facts not alleged here. *See id.*[14]

Based on this, and in the absence of any other authority cited by Plaintiffs, the Court finds that Plaintiffs have not demonstrated that Defendants violated any clearly established rights. Accordingly, even if Defendants were not entitled to absolute immunity, they would be entitled to qualified immunity. The individual-capacity claims against Albrecht, Keen, and Emler are therefore dismissed without prejudice.

### B.    Official-Capacity Claims Against Albrecht, Keen, and Duffy

Plaintiffs also assert official-capacity claims against Albrecht, Keen, and Duffy. A § 1983 claim against an individual defendant in her official capacity is tantamount to a claim against the state entity itself. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). Defendants argue Plaintiffs' official-capacity claims should be dismissed because the Eleventh Amendment shields the state from suit in federal court, except as to prospective injunctive relief. Doc. 41 at 20; *see also Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004) ("As the district court correctly held, the claims for back pay, monetary damages, and retrospective declaratory relief are barred by the Eleventh Amendment."). Plaintiffs clarify in their response that the official-capacity claims

---

[14]    *Downie*'s relevance is further questionable because the court ultimately found that the Privacy Act prevented any constitutional claim based on the retention or dissemination of the "blackball memo." *Downie*, 76 F. Supp. 2d at 803.

are limited to prospective injunctive relief. Doc. 45 at 21-22. But Defendants contend that Plaintiffs lack standing to seek injunctive relief. Doc. 41 at 22-23.

The burden of alleging standing is on a plaintiff. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006). To demonstrate an actual stake in the controversy, a plaintiff must first demonstrate that he has suffered an injury in fact. *See Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003). An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Initiative & Referendum*, 450 F.3d at 1087 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Where prospective relief is sought, a "plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004).

A past wrong in and of itself does not confer standing for prospective relief, absent some "credible threat of future injury" or "a sufficient likelihood that [the plaintiff] will again be wronged in a similar way." *Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir. 2007); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). "A claimed injury that is contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction." *Tandy*, 380 F.3d at 1283-84.

Plaintiffs argue they have alleged three ongoing constitutional violations that warrant prospective injunctive relief. First, Yeargain contends the KCC is maintaining a "no-contact list" of prominent protesters, including Yeargain. Doc. 45 at 23.[15] Second, Plaintiffs contend that Yeargain has never been notified by the attorney general that the investigation into him has concluded, and it would be reasonable to infer that Defendants continue to share evidence and

---

[15] To the extent Plaintiffs are seeking relief on behalf of other unnamed protesters, that request is not proper, as only Hoedel and Yeargain are named as plaintiffs in this case.

perpetuate the investigation. *Id.* Third, Plaintiffs contend they "are still laboring under an ongoing threat of future enforcement" because of the KCC's regulatory authority over injection-well protests, past behavior of "targeting oil injection well protesters," and statements by the KCC that KCC officials are authorized to report protesters for the unauthorized practice of law. *Id.* at 24.

First, the Court has already noted that the amended complaint includes nothing more than a passing allegation that the KCC is maintaining a "no-contact list" of prominent protesters, including Yeargain. There are no facts alleging how a "no-contact list" constitutionally harms Yeargain, if at all, or if it limits his ability to file protests with the KCC. Although Plaintiffs equate this to a "government blacklist," Doc. 45 at 23, they do not elaborate on how this is the case and point to no allegations in the amended complaint that would support such an inference. This fails to state a claim for an ongoing constitutional violation.

Second, Yeargain claims he has pleaded a continuing constitutional violation because he has never been notified by the attorney general that the investigation into him has concluded, and it would be reasonable to infer that Defendants continue to share evidence and perpetuate the investigation. But the constitutional violation alleged is Kirk's <u>reporting</u> Yeargain for the unauthorized practice of law. There are no allegations that the Kansas Attorney General's <u>investigation</u> of Yeargain—even assuming by negative inference that it remains ongoing—is a constitutional violation, let alone one by Defendants, who do not work for that office. Plaintiffs argue "it would be reasonable for the Court to infer that Defendants' retaliatory conduct . . . is ongoing" because Kirk's June 12 email "volunteered to continue to gather and share evidence to perpetuate the investigation." Doc. 45 at 23. But that is an inference too far. A one-time offer to provide more information upon request, *see* Doc. 41-10 at 2, does not suggest an ongoing constitutional violation.

Third, Plaintiffs argue that they are entitled to seek prospective injunctive relief because the KCC still oversees injection-well applications, Plaintiffs continue to engage in injection-well protest activities,[16] and the KCC has a "pattern of targeting" protesters and a "publicly-articulated" policy of reporting protesters. Doc. 45 at 24. But a past wrong against a plaintiff does not entitle him to assert a claim for prospective relief. *Lyons*, 461 U.S. at 111. Nor does the KCC's so-called policy of reporting protesters. *See* Doc. 31 at ¶ 70.[17] The Supreme Court, in *City of Los Angeles v. Lyons*, which involved the use of illegal chokeholds by police, found this type of hypothetical possibility of future action to be insufficient to state a claim for prospective relief. *Lyons* held that the plaintiff would have to "make the incredible assertion" that he would have an encounter with police, and that all police will always choke any citizen, or that the city ordered them to act that way. *Lyon*, 461 U.S. at 105-06 ("The additional allegation in the complaint that the police in Los Angeles routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy

---

[16] Plaintiffs do not specifically argue that they have grounds to seek prospective injunctive relief based on an ongoing chilling to their First Amendment activity, based on the past conduct of Defendants. Even if they did, the Court would not find it sufficient to maintain a claim for injunctive relief. Although chilling can create a judicially cognizable injury, a subjective chilling is not enough. *Initiative & Referendum*, 450 F.3d at 1088. The chilling must arise from an objectively justified fear of consequences, *see id.*, something Plaintiffs have not shown as discussed above. Any claim of a subjective chill is somewhat dubious, as Plaintiffs have acknowledged that they continue to engage in injection-well protest activities. Doc. 45 at 24 ("Plaintiffs allege that they are still engaging in injection well protest activities before the KCC.").

[17] The amended complaint says that the "Defendant Commissioners' spokeswoman Linda Berry affirmed that attorneys within the agency can file an accusation of unauthorized practice of law against oil injection protesters with the Attorney General's Office at any time." Doc. 31 at ¶ 70. The amended complaint cites an editorial in support. The relevant portion of that editorial states: "Berry also appeared to distance the agency from Kirk's accusations. 'The agency is not aware of the details of that complaint nor do we have a copy of it,' she wrote, adding that any attorney can file such an accusation." *See* Editorial, *Activists raised questions about a state agency. Now, the Kansas AG is investigating them*, THE KANSAS CITY STAR, August 22, 2018, available at https://www.kansascity.com/opinion/editorials/article217065085.html#storylink=cpy. The Court questions whether this statement can be fairly characterized as a "publicly-articulated KCC policy of reporting oil injection protesters to the Attorney General for merely coordinating with one another in quasi-judicial proceedings." *See* Doc. 45 at 24.

between these parties."). The statement by KCC officials that staff "can" report protesters is not enough under this precedent.

Accordingly, Plaintiffs have failed to allege a sufficient factual basis to support a claim for prospective injunctive relief. The official-capacity claims against Albrecht, Keen, and Duffy must be dismissed without prejudice.[18]

## IV.   CONCLUSION

THE COURT THEREFORE ORDERS that Defendants' Motion to Dismiss (Doc. 40) is GRANTED. Albrecht, Keen, and Emler are entitled to absolute immunity, or in the alternative, qualified immunity, on the individual-capacity claims, which are DISMISSED without prejudice. The official-capacity claims against Albrecht, Keen, and Duffy are likewise DISMISSED without prejudice for failure to state a claim.

THE COURT FURTHER ORDERS that Albrecht, Keen, Emler, and Duffy are DISMISSED from this case.

IT IS SO ORDERED.

Dated: August 20, 2020                            /s/ *Holly L. Teeter*
                                                  HOLLY L. TEETER
                                                  UNITED STATES DISTRICT JUDGE

---

[18] Defendants alternatively argue that Plaintiffs fail to state a § 1983 claim because their claims are based on a theory of respondeat superior, no action was taken under color of state law, and reporting illegal behavior cannot be a constitutional violation. The Court does not reach these arguments because it finds that Defendants are entitled to immunity on the individual capacity claims and Plaintiffs lack standing as to the official-capacity claims.